## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**JOANNE DAVIS,**

      **Plaintiff,**

          **v.**

**JACKSON COUNTY MUNICIPAL
COURT,** *et al.,*

      **Defendant.**

**Case No. 2:11-CV-00919**
**JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Norah McCann King**

### OPINION AND ORDER

Plaintiff, Joanne Davis ("Davis"), brings this action against Defendants Jackson County

Municipal Court Judge Mark T. Musick ("Judge Musick") and Wesley Skaggs ("Skaggs")

(collectively "Defendants"). Plaintiff asserts various federal and state causes of action including

failure to pay overtime compensation in violation of the Fair Labor Standards Act of 1938

("FLSA") and the Ohio Minimum Fair Wage Standards Act ("MFWSA"); retaliation in violation

of Title VII of the 1964 Civil Rights Act ("Title VII") and Ohio Revised Code Chapter 4112; and

defamation. This matter is before the Court for consideration of Defendants' Motion for

Summary Judgment. (ECF No. 33.) For the reasons that follow, Defendants' Motion is

**GRANTED** in part and **DENIED** in part.

### I. Background

**A.**    **Relevant Facts**

    **1.**    **The Electronic Monitoring and House Arrest Program**

The Jackson County Municipal Court ("Municipal Court") hired Davis as an hourly

employee in February 2008. (Musick Dep. 20, ECF No. 37-2.) From 2008 to 2010, Davis

worked in the position of Electronic Monitoring and House Arrest ("EMHA") Coordinator.
(Venatter Dep. 14–15, ECF No. 37-3.)  Donald Ray Venatter ("Venatter") supervised the EMHA
program and was Davis' direct supervisor while she was the EMHA Coordinator.  (Venatter Dep.
16.)  Judge Musick was Venatter's immediate supervisor.  (*Id.* at 10.)  According to Judge
Musick, Venatter reported to him intermittently concerning the EMHA program.  (Musick Dep.
15.)  Venatter generally described Judge Musick as being "pretty hands-on" and stated that he
made few decisions without consulting Judge Musick.  (Venatter Dep. 11.)  Defendant Skaggs
was an employee of the Municipal Court's Probation Department during much of the relevant
period.  (*See* Musick Dep. 58.)

The Municipal Court contracted with Secure Alert, a private company, to provide
equipment and services for the electronic monitoring of probationers.  (*See* Venatter Dep. 18.)
Specifically, Secure Alert provided the Municipal Court with ankle monitors that utilized GPS
satellite technology.  (*Id.*)  The Municipal Court paid Secure Alert to monitor individuals twenty-
four hours a day, seven days a week.  (*Id.*)  Moreover, Secure Alert created a monitoring website
to which the Municipal Court had access.  (*See id.* at 25.)  Venatter stated that Secure Alert
would send an alert notification when, for whatever reason, a monitoring alarm went off.  (*Id.* at
25–26.)  Such alerts could come at any time of the day.  (*Id.* at 27; *see also* Musick Dep. 34.)  As
EMHA Coordinator, Davis was the Municipal Court employee responsible for handling the day-
to-day operations for the electronic monitoring of offenders on house arrest.  (Venatter Dep. at
21, 24–25; Musick Dep. 28.)  According to both Venatter and Judge Musick, Davis acted as the
liaison between the Secure Alert monitoring center and the Court.  (Venatter Dep. 15; Musick
Dep. 27–28.)

Davis maintains that her duties as EMHA Coordinator consistently required her to perform substantial amounts of work outside of her general 8:00 to 4:00 schedule. (*See* Davis Dep. 120.) The parties dispute the extent to which Davis' supervisors were aware of her after-hour work and whether the Municipal Court properly compensated Davis for her overtime hours.

### 2.    Davis' Post-EMHA Working Conditions, Leave of Absence, and Termination

In early 2010, the Municipal Court decided to cancel the EMHA program. (*See* Davis Dep. 32–33; Musick Dep. 19.) At this time, Judge Musick moved Davis from the probation department to an intake position. (Davis Dep. 32–33.) Although Judge Musick had only a vague recollection of the situation, he asserted that part of the reason for moving Davis was that a co-worker (or co-workers) was upset with Davis. (Musick Dep. 58.) Venatter indicated that he recalled some concern for Davis' safety due to employee complaints during the relevant period. (*See* Venatter Dep. 93.)

Davis contends that her co-workers harassed her after she was reassigned to an intake position. During her deposition, Davis specifically stated that her co-workers accused her of selling drugs and having an affair with Venatter. (Davis Dep. 157.) According to Venatter, Davis told him that Skaggs had accused her of dealing drugs. (Venatter Dep. 74.) Venatter averred, however, that Skaggs never personally made such a statement to him. (*Id.*) Judge Musick and Venatter indicated that an informant, Kristie Rose, told a group of Municipal Court employees—including Skaggs—that Davis was dealing drugs and food stamps.[1] (*See* Venatter Dep. 68–69; Musick Dep. 79–80.) Venatter asserted that he was generally aware that rumors

---

[1] Judge Musick stated that the Municipal Court took this information to the Jackson County Prosecutor for investigation. (Musick Dep. 80.)

were circulating that he was having an affair with Davis. (Venatter Dep. at 83.)  Venatter, however, was unable to attribute such accusation to any particular employee.  (*Id.*)  Vicki Harper, a probation officer with the Municipal Court, recalled rumors that Davis was being investigated for selling drugs.  (Harper Dep. 32.)  Like Venatter, Harper was unable to attribute such statements to any specific person.  (*Id.* at 32–33.)

Davis also stated that, during this same general period, a probationer—Crystal Crabtree—approached her and asked her to buy food stamps.  (Davis Dep. 158.)  Davis asserted that, after she refused, Ms. Crabtree stated that Skaggs had asked her to set Davis up.  (*Id.* at 158–59.)  In October 2010, Davis filed a written complaint with the Municipal Court concerning the rumors circulating about her as well as the food stamp incident.  (Davis Dep. Ex. 19, ECF No. 45-1.)

Davis took a medical leave of absence beginning in November 2010 due to stress-related conditions.  (*See* Davis Dep. 191–93; Venatter Dep. Ex. D, ECF No. 46-1.)  On November 22, 2010, Davis filed charges of sex and retaliatory discrimination with the Ohio Civil Rights Commission ("OCRC") and Equal Employment Opportunity Commission ("EEOC") based on her working conditions.  (Davis Dep. Ex. 25, ECF No. 45-2.)  Both Judge Musick and Venatter were aware of the charges.  (Musick Dep. 77; Venatter Dep. 114–15.)  During her deposition, Davis stated that in early 2011 Venatter informed her that Judge Musick had instructed Venatter to "find a way to get rid of her" if she returned to work.  (Davis Dep. 230.)  Venatter denied that Judge Musick made any such comment to him and stated that Judge Musick approved of Davis returning to work.  (Venatter Dep. 110.)  Venatter, however, recommended that Davis not return to work because he did not think it would be a healthy work environment for Davis, himself, or

4

others. (*Id.* at 110–12.) Venatter averred that the Municipal Court did not accept his recommendation. (*Id.* at 112.)

The record reflects that Davis remained on medical leave, under the Family Medical Leave Act ("FMLA"), into February 2011. (Davis Dep. 196–97; Venatter Dep. Ex. D.) Davis stated that her doctors still kept her from working after her FMLA leave ended. (Davis Dep. 197–98.) Davis reported that she met with Judge Musick in May 2011 after her doctors had released her to return to work. (*Id.* at 203–04.)

Davis ultimately returned to work on June 13, 2011 for one day. (Davis Dep. 212; Musick Dep. 86.) Davis stated that her return to work was stressful due to a number of factors. (Davis Dep. 213–14.) For example, Davis stated that upon her return she discovered that her belongings were in a dirty closet and covered in mouse feces. (*Id.* at 214.) Davis also testified that Skaggs said, in her presence, "I don't know how the bitch got back in here, but I will get rid of her." (*Id.* at 218.) Venatter stated that Davis' assigned office contained sandbags on the day of her return because of a recent flood. (Venatter Dep. 98–100.) Davis asserted that the sandbags were wet, appeared moldy, and smelled. (Davis Dep. 234.) According to Davis, Venatter told her that he had asked to move the sandbags, but that Judge Musick wanted the sandbags left in the office. (*Id.*) During his deposition, Judge Musick stated that the sandbags were not in Davis' office, but were in the intake office where Davis only needed to perform minimal work. (Musick Dep. 62, 64.) Judge Musick denied that the sandbags were wet. (*Id.* at 62.)

According to Davis, after returning home from work on June 13, 2011, she went to see her doctor, who advised her not to return to work. (Davis Dep. at 217–18.) The record indicates

that Davis' doctor ultimately sent the Municipal Court a letter indicating that she could not return

to work until September 2011. (*See id.* at 220, 236; Venatter Dep. Ex. D.)

Davis received a termination letter from Judge Musick on July 25, 2011. (Davis Dep.

221.) The letter specifically stated:

> Dear Joanne,
>
> I met last week with the County Board of Commissioners, during which I was
> advised of the necessity to reduce the court's expenditures before the end of 2011.
> As a result, the court is eliminating the positions of three employees, and reducing
> the hours of another, the first phase beginning August 1, 2011.
>
> The position set aside for your return to work was a logical candidate for elimination
> because the court has been operating without some of those functions, and the rest
> can be absorbed by remaining employees.
>
> Further, we received today a note from your doctor's office, which states you will not
> be able to return to work until September 25, 2011. You have not worked since
> November 2010 and have been on unapproved leave since the end of your FMLA
> leave on February 2, 2011, with the exception of one day. The court nevertheless
> provided you with every opportunity to return to work as well as health benefits at
> significant cost to the court.
>
> It would be an unreasonable burden on the court to maintain a position that is not
> being file and is no longer needed. Your termination is effective July 31, 2011. . . .

(Venatter Dep. Ex. D.) Judge Musick also stated at his deposition that "[n]obody terminated

[Davis] until 2011 when she just wouldn't come to work." (Musick Dep. 90.) Judge Musick

asserted that the Municipal Court also eliminated the position of two other employees, Joyce and

Jim Slone, at that time. (*Id.* at 107–08.) Venatter, however, could not remember Judge Musick

terminating anyone else. (Venatter Dep. 117.) Venatter testified that one employee was hired

after July 25, 2011 who performed at least some of the job duties that Davis was responsible for

at the time of her termination. (Venatter Dep. 108.) Although Judge Musick was uncertain as to

precise dates, he suggested that at least one employee was hired after Davis' termination.  (*See* Musick Dep. 110–11.)

**B.      Procedural History**

Davis filed this action in October 2011.  Within her Amended Complaint, Davis asserts official capacity claims against Judge Musick for failure to pay overtime compensation in violation of the FLSA and the MFWSA; retaliation in violation of the FLSA and the MFWSA; retaliation in violation of Title VII; and wrongful termination in violation of Ohio public policy. Davis also brings claims against Judge Musick, in both his official and individual capacity, for retaliation under Ohio Revised Code Chapter 4112.  Finally, Davis brings a claim against Skaggs for defamation.[2]

On November 21, 2012, Defendants moved for summary judgment as to all of Davis' claims.  Davis subsequently responded in opposition.  On April 12, 2013, the Court alerted the parties that it was considering whether Eleventh Amendment immunity bars some of Davis' official capacity claims against Judge Musick.  The Court directed, and the parties provided, briefing on the issue.

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court may therefore grant a motion for summary judgment if the nonmoving party

---

[2] The Amended Complaint indicates that Davis is also proceeding with a defamation claim against Judge Musick.  Defendants address such claims within their Motion for Summary Judgment.  Within briefing, however, Davis represents that—in light of discovery—she will not pursue such a claim.  Accordingly, Defendants Motion for Summary Judgment is **GRANTED** as to this claim.

who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (internal quotations omitted). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby, Inc.*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby, Inc.*, 477 U.S. at 251–52.

### III. ANALYSIS

As detailed above, Plaintiff brings claims for failure to pay overtime wages, retaliation, wrongful discharge in violation of public policy, and defamation. Defendants move for summary

judgment as to all claims.  Additionally, Defendants maintain that they are entitled to qualified immunity as to Plaintiff's federal claims and immunity under Ohio Revised Code Chapter 2744 as to Plaintiff's state law claims.  The Court will first consider the application of Eleventh Amendment immunity to Plaintiff's official capacity claims, and will then—to the extent necessary—address Defendants' contentions.

## A.    Eleventh Amendment Immunity

Davis brings official capacity claims against Judge Musick for failure to pay overtime in violation of the FLSA and the MFWSA; retaliation in violation of the FLSA, the MFWSA, Title VII, and Ohio Revised Code Chapter 4112; and wrongful discharge in violation of Ohio public policy.  Davis seeks relief in the form of monetary damages on these claims.

The Eleventh Immunity generally grants immunity to states from claims in federal court. *VIBO Corp., Inc. v. Conway*, 669 F.3d 675, 691 (6th Cir. 2012).  Moreover, "[a] claim against a state officer acting in his official capacity is deemed to be a claim against the state for sovereign immunity purposes." *Id.*  Sovereign immunity may not apply "where Congress abrogates sovereign immunity." *Id.*

Specifically, sovereign immunity will not apply when Congress has abrogated it under expressed authority in the Constitution.  This case involves official capacity claims pursuant to Title VII, the FLSA, and state statutory and common law.  With regard to Title VII, "Congress acted validly under its Fourteenth Amendment Enforcement Clause powers to abrogate state sovereign immunity to Title VII claims." *Cox v. Shelby State Cmty. Coll.*, 48 F. App'x 500, 504–05 (6th Cir. 2002) (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976)).  The FLSA, however, did not validly abrogate state sovereign immunity, and, therefore, "the Eleventh Amendment bars

suit under the FLSA by private citizens against the state." *Kohus v. Ohio State Highway Patrol*,

No. 1:09–cv–658, 2011 WL 1234021,at *16 (S.D. Ohio Feb. 15, 2011); *see also Wilson–Jones v.

Caviness*, 99 F.3d 203, 205–06 (6th Cir.1997), *modified*, 107 F.3d 358 (6th Cir. 1997) ("[W]e

hold that the part of the FLSA that purports to give federal courts jurisdiction over an action

against a state for violation of the FLSA's minimum wage and maximum hour provisions is

unconstitutional and, therefore, the district court was without jurisdiction over the plaintiffs'

case."). Finally, "Congress has not abrogated the Eleventh Amendment for state law

claims . . . ." *McCormick*, 693 F.3d at 664.

  Eleventh Amendment immunity covers entities that are "arm[s] of the state." *McCormick

v. Miami Univ.*, 693 F.3d 654, 661 (6th Cir. 2012). On the other hand, "sovereign immunity does

not extend to an entity that is not an arm of the state, including municipal and county

entities . . . ." *Pucci v. Nineteenth Dist. Court*, 628 F.3d 752, 765 (6th Cir. 2010) (internal

quotations omitted). Consequently, in considering Eleventh Amendment Immunity, the Court

must distinguish between entities that are arms of the state and entities that are separate political

subdivisions. *Smith v. Leis*, 407 F. App'x 918, 932 (6th Cir. 2011). In making this

determination, the Court looks to the following factors:

> (1) [T]he State's potential liability for a judgment against the entity; (2) the language
> by which state statutes and state courts refer to the entity and the degree of state
> control and veto power over the entity's actions; (3) whether state or local officials
> appoint the board members of the entity; and (4) whether the entity's functions fall
> within the traditional purview of state or local government.

*Pucci*, 628 F.3d at 760.

  Because of Ohio municipal courts' clear relationship to the state, the Court finds that the

Jackson County Municipal Court is an arm of the state for the purposes of Eleventh Amendment

immunity. The Jackson County Municipal Court is part of the Ohio state court system, created by the Ohio state legislature. Ohio Rev. Code § 1901.01; *see also Smith v. Leis*, 407 F. App'x 918, 932 n.10 (6th Cir. 2011) (noting that sovereign immunity concerns "are particularly relevant in a suit against a state court, which is the adjudicative voice of the State itself") (internal quotations omitted). Moreover, the Jackson County Municipal Court "is subject to the supervision of the Ohio Supreme Court. Ohio Const., Art. IV, § 5. The municipal court may not be abolished by the city council, nor may the council expand or restrict the court's jurisdiction." *Foster*, 864 F.2d at 418–19.

In light of such factors, this Court has consistently held that Eleventh Amendment immunity applies to Ohio municipal courts. *See, e.g., Lott v. Marietta Mun. Court*, 2:12–cv–1089, 2012 WL 6611615, at *1 (S.D. Ohio Dec. 19, 2012) ("An Ohio municipal court is a component of state government and is therefore insulated from private federal court litigation by the Eleventh Amendment.") (Report and Recommendation later adopted); *Wise v. Steubenville Mun. Court*, No. 2:08-cv-00577, 2008 WL 4849233, at *1 (S.D. Ohio Nov. 6, 2008) (concluding that the Eleventh Amendment barred a suit against the Steubenville Municipal Court); *Sampson v. City of Xenia*, 108 F. Supp. 2d 821, 840 (S.D. Ohio 1999) ("the Eleventh Amendment to the United States Constitution bars [the plaintiff] from maintaining a lawsuit against the Xenia Municipal Court, because the Court is an arm of the state."). Finally, by extension, Eleventh Amendment immunity also applies to municipal court judges sued in their official capacity. *See Pucci*, 628 F.3d at 765 (holding that the chief judge of Michigan's Nineteenth District Court—serving Dearborn, Michigan—was entitled to sovereign immunity "in his official capacity with respect to damages and retrospective relief").

11

The Court finds Plaintiff's assertion, that the Jackson County Municipal Court is a political subdivision, unpersuasive. According to Plaintiff, Judge Musick's pleadings reflect that Jackson County, as opposed to the state of Ohio, would pay any damage award. Even assuming this to be the case, the Sixth Circuit has cautioned—in considering application of the Eleventh Amendment to a state court—that "[w]hile there can be little doubt that the state-treasury inquiry will generally be the most important [factor], it also seems clear that it is not the sole criterion for determining whether an agency is a state entity for sovereign immunity purposes." *Pucci*, 628 F.3d at 761 (internal quotatiosn omitted). The *Pucci* Court stressed the "'twin reasons' for granting states sovereign immunity: the desire not to infringe either a state's purse or its dignity." *Id.* Moreover, the fact that Defendants consider the Municipal Court to be a political subdivision for the purposes of state-law immunity, does not control the Eleventh Amendment inquiry. Finally, Plaintiff stresses that the Ohio Attorney General is not representing Judge Musick in this case. Under the circumstances of this case, however, and in light of the other factors, the Court finds Defendant's representation of limited value to the Eleventh Amendment analysis.

Because the Jackson County Municipal Court is an arm of the state, Eleventh Amendment immunity bars Davis' FLSA claims and state law claims against Judge Musick in his official capacity. Specifically, to the extent Davis brings official capacity causes of action, she is bringing suit against the Jackson County Municipal Court. Moreover, Davis' claims are for retrospective relief in the form of monetary damages. Consequently, Eleventh Amendment immunity applies to Plaintiff's official capacity FLSA and state law claims. Nevertheless, for the reasons described above, Eleventh Amendment immunity does not apply to Davis' Title VII retaliation claim. Moreover, the Eleventh Amendment does not bar Davis' individual claims

against Judge Musick for state-law retaliation and Skaggs for defamation.[3] The Court will, therefore, address the remaining claims.

**B.    Retaliation**

Davis brings claims against Judge Musick for retaliation pursuant to Title VII and Ohio Revised Code Chapter 4112. Davis specifically maintains that her discharge was in retaliation for filing of discrimination charges with the OCRC and EEOC. Judge Musick contends that the evidence demonstrates that Davis was terminated because she failed to attend work, not because of retaliatory motive.

"Title VII . . . prohibits an employer from retaliating against an employee who has opposed an 'unlawful employment practice.'" *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 468 (6th Cir. 2012) (quoting 42 U.S.C. § 2000e-3(a)). Ohio's anti-discrimination statute applies the same prohibition on retaliation. *See Hughes v. Miller*, 181 Ohio App. 3d 440, 447 (Ohio Ct. App. 2009) ("[T]he standard for proving retaliatory discrimination in the employment context is the same under Ohio law as it is under Title VII.").

To demonstrate a prima facie case of retaliation, a plaintiff must establish that (1) she

_____

[3] Within their supplemental briefing on Eleventh Amendment immunity, Defendants maintain that the pleadings are insufficient to raise claims against them in their individual capacities. Notably, Defendants failed to raise this issue within their initial Motion, and this argument goes beyond the issue for which the Court requested supplemental briefing. Regardless, the Court finds Defendants' contentions unavailing. With respect to Judge Musick, the only individual capacity claim at issue is retaliation under Ohio Revised Code Chapter 4112. Ohio case law makes clear that "'individual supervisors and managers whose conduct violates the provisions of . . . Chapter 4112 [of the Ohio Revised Code] fall within the applicable statutory definition of employer.'" *Price v. Carter Lumber Co.*, No. 24991, 2010 WL 3582659, at *6 (Ohio Ct. App. Sept. 15, 2010) (quoting *Genaro v. Cent. Transp. Inc .*, 84 Ohio St. 3d 293, 296 (Ohio 1999)). Plaintiff's pleadings are sufficient to raise such a theory of liability. Moreover, the Court finds it sufficiently clear from the Amended Complaint that Plaintiff is bringing a defamation claim directly against Defendant Skaggs.

13

engaged in protected activity; (2) her employer knew of the protected activity; (3) her employer took an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Wasek*, 682 F.3d at 468–69. Once a plaintiff establishes a prima facie case, the employer must offer a legitimate, nondiscriminatory reason for the adverse action. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). If the employer meets this requirement, the plaintiff must then show that the proffered reason is actually a pretext for unlawful retaliation. *Id.* "[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Id.* (internal quotations omitted). "[A]t bottom the question is always whether the employer made up its stated reason to conceal intentional [retaliation]." *Id.* (internal quotations omitted).

"To establish causation, [a plaintiff] must produce sufficient evidence from which an inference can be drawn that he would not have been fired had he not engaged in the protected activity." *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 571 (6th Cir. 2009). Moreover, "[c]ausation can be inferred from indirect or circumstantial evidence, including 'evidence that [the] defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights.'" *Id.* (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). The Sixth Circuit has acknowledged that "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie

14

case of retaliation." *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Nevertheless, "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.*

In this case, the parties do not dispute the first three prima facie elements, at least for the purposes of summary judgment. Davis engaged in protected activity by filing discrimination and retaliation charges with the OCRC and EEOC. The deposition testimony reflects that both Judge Musick and Venatter were aware of these charges. Additionally, it is undisputed that Judge Musick terminated Davis in July 2011.

Causation and pretext present closer issues. Judge Musick maintains that Davis was terminated because she stopped coming to work after her FMLA leave expired. The record evidence establishes that Davis did not attend work for an extended period leading up to her termination. Specifically, between November 2010 and Davis' termination in July 2011, the evidence indicates that Davis only attended work for one day, June 13, 2013. (*See* Davis Dep. 212; Musick Dep. 86.) Although Davis was on medical leave during this period, her FMLA leave expired in February 2011. (*See* Davis Dep. 196–97; Venatter Dep. Ex. D.) Moreover, at least some evidence—including Davis' termination letter—suggests that budgetary concerns may have played a role in Davis' termination. (*See, e.g.*, Venatter Dep. Ex. D.) Both budgetary and attendance concerns represent legitimate, non-discriminatory justifications for Davis' termination.

Nevertheless, Davis has submitted sufficient evidence to raise triable issues of fact as to causation and pretext. Although the timing of events alone—over sixth months between

15

protected activity and ultimate termination—is not likely enough in itself, combining the timing

of events with other circumstances allows for a reasonable inference of a causal link between the

protected activity and Davis' termination.  Importantly, Davis asserted that in early 2011, shortly

after the relevant protected activity, Judge Musick gave Venatter instructions to "find a way to

get rid of [Davis]" if she attempted to return to work.[4]  (Davis Dep. 230.)  Venatter admitted that,

during Davis' leave of absence, he did not think that Davis should return to work because of the

environment she would face.[5]  (Venatter Dep. at 110–12.)  Moreover, construing the facts and

testimony in Davis' favor, when she attempted to return to the Municipal Court, she was

subjected to unpleasant working conditions.  (*See, e.g.*, Davis Dep. 213–14, 234.)  Finally, there

is a factual dispute in the record concerning whether there was truly a budgetary need to

eliminate employment positions at the time of Davis' termination.  (*Compare* Musick Dep.

107–08, 110–11; Venatter Dep. 108, 117.)  Given the combination of these circumstances, a

reasonable jury could find causation and also that Judge Musick's proffered reasons for Davis'

termination were pretextual.  *Cf. Urton v. Bd. of Educ. of Lockland City Sch. Dist.*, No.

1:07cv387, 2009 WL 243036, at *7 (S.D. Ohio Jan. 30, 2009) (finding evidence that a supervisor

---

[4] The Court recognizes potential hearsay within hearsay concerns relating to this evidence, as Davis is relaying a statement that Judge Musick purportedly said to Venatter. Although Defendants raise hearsay issues concerning Davis' defamation claim, they do not specifically object to this evidence. Both Judge Musick and Venatter's declarations constitute opposing party statements within the meaning of Federal Rule of Evidence 801(d)(2). *See Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 722 (6th Cir. 2006) (holding that testimony regarding a deputy chief's statement regarding the instructions of the police chief was not inadmissible hearsay). The Court, however, may revisit this issue at a later time.

[5] Venatter stated that Davis' filing of charges was "[n]ot necessarily" a factor in his recommendation, but his statements on the issue were at least somewhat ambiguous. (*See* Venatter Dep. 111–13.)

was instructed to get an employee "out of the office" after complaints was sufficient to create an issue of fact as to pretext). Accordingly, Judge Musick is not entitled to summary judgment as to the remaining retaliation claims.

## C. Defamation

Davis also brings a claim for defamation against Skaggs, maintaining that Skaggs told co-workers that Davis was dealing drugs, attempting to purchase food stamps, and having an affair with Venatter.[6] (Am. Compl. ¶¶ 14, 52.) Defendants maintain that there is no evidence, outside of hearsay, that Skaggs made defamatory statements.

Under Ohio law, to bring a claim for defamation a plaintiff must establish that the defendant made "(1) a false and defamatory statement, (2) about the plaintiff, (3) published without privilege to a third party, (4) with fault or at least negligence on the part of the defendant, and (5) that was either defamatory per se or caused special harm to the plaintiff." *Thomas v. Cohr, Inc.*, 197 Ohio App. 3d 145, 151 (Ohio Ct. App. 2011).

The Court finds that Defendant Skaggs is entitled to summary judgment. A reasonable jury could not find Skaggs liable for defamation based on the record evidence. The evidence reflects that, during Davis' employment, rumors were circulating through the Municipal Court that Davis was dealing drugs and having an affair with Venatter. (*See, e.g.*, Harper Dep. 32; Venatter Dep. at 83.) Davis, however, fails to link such rumors to any false statements that Skaggs made. According to Venatter, Davis told him that Skaggs was making accusations against her. (Venatter Dep. 74.) Nevertheless, Davis fails to provide evidence, through her

---

[6] Once again, the Court finds it unnecessary to specifically address Davis' defamation claim against Judge Musick, as Davis represents that she will no longer pursue this claim.

deposition testimony or otherwise, that she or any one else actually heard Skaggs making false statements. Moreover, Davis does not establish that Skaggs made the alleged statements to a third party. At most, the record evidence indicates that Skaggs, along with two other Municipal Court employees, reported to Venatter that an informant—Kristie Rose—was accusing Davis of dealing drugs and selling food stamps. (Venatter Dep. 67–69.) Nevertheless, the evidence before the Court does not establish that Skaggs statements, essentially that an informant was making accusations, were untrue.[7]

Additionally, the Court is not convinced that Davis' testimony regarding Crystal Crabtree is sufficient to raise a triable issue of fact concerning defamation. Davis stated that Ms. Crabtree attempted to sell her food stamps. (Davis Dep. 158–59.) According to Davis, Ms. Crabtree then informed her that Skaggs was trying to set her up for buying food stamps. (*Id.*) As an initial matter, Davis' statement regarding Ms. Crabtree's comments is hearsay. Davis relies on Ms. Crabtree's statement for the truth of the matter asserted, that Skaggs was trying to set Davis up. Regardless, even assuming such evidence is sufficient to show that Skaggs instigated Davis' encounter with Ms. Crabtree, this evidence still does not establish that Skaggs made a defamatory statement.

**E.    Qualified Immunity**

With regard to Davis' remaining Title VII official capacity claim, Judge Musick contends that he is entitled to qualified immunity. According to Judge Musick, the evidence at best reflects a mere mistake in judgment on his part.

---

[7]  Notably, Davis' own deposition statements suggest that Ms. Rose made the accusations in question. (*See* Davis Dep. 158.)

18

"The qualified-immunity doctrine shields government officials performing discretionary functions from civil liability unless their conduct violates clearly established rights." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013).  The doctrine protects public officials from liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Martin v. City of Broadview Heights*, — F.3d —, 2013 WL 1405247, at *4 (6th Cir. Apr. 9, 2013) (internal quotations omitted).  As the Sixth Circuit has recognized, qualified immunity "is a doctrine applicable only in the context of individual-capacity suits." *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 219 (6th Cir. 2011).

In this case, the Court finds that the doctrine of qualified immunity is inapplicable to Davis' federal claims against Judge Musick.  Specifically, Davis brings his Title VII claim against Judge Musick in his official capacity.  *See Freshwater v. Mount Vernon City Sch. Dist. Bd. of Educ.*, No. 2:09–cv–464, 2009 WL 4730597, at *7 (S.D. Ohio Dec. 8, 2009) (holding that the doctrine of qualified immunity was irrelevant to official capacity Title VII claims).  Accordingly, Judge Musick is not entitled to summary judgment based on qualified immunity.

**F.    Immunity under Ohio Revised Code Chapter 2744**

Finally, Judge Musick contends that he is entitled to immunity under Ohio statutory law as to Davis' individual capacity retaliation claim under Ohio Revised Code Chapter 4112.  Judge Musick specifically asserts that, as an employee of a political subdivision, he is immune pursuant to Ohio Revised Code § 2744.03(A)(6).

Ohio Revised Code § 2744.03(A) provides in pertinent part:

(6)    In addition to any immunity or defense referred to in division (A)(7) of this

19

section . . . the employee [of a political subdivision] is immune from liability unless one of the following applies:

(a)     The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;

(b)     The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

(c)     Civil liability is expressly imposed upon the employee by a section of the Revised Code. Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon an employee, because that section provides for a criminal penalty, because of a general authorization in that section that an employee may sue and be sued, or because the section uses the term "shall" in a provision pertaining to an employee.

Ohio Rev. Code § 2744.03(A)(6).

Even assuming that the Jackson Municipal Court is a political subdivision under Ohio law, § 2744.03(A)(6) employee immunity does not apply to the claim in this case. Both this Court and the majority of Ohio courts to consider the issue have held that Ohio Revised Code Chapter 4112 expressly imposes liability on employees within the meaning of Ohio Revised Code § 2744.03(A)(6)(c). *See, e.g.*, *Satterfield v. Karnes*, 736 F. Supp. 2d 1138, 1154 (S.D. Ohio 2010) (holding that § 2744.03(A)(6)(c) operates to withdraw immunity for retaliation claims under Chapter 4112); *Hauser v. Dayton Police Dept.*, — N.E. 2d —, 2013 WL 56149, at *4–6 (Ohio Ct. App. 2013) (collecting case law and "agree[ing] that civil liability is expressly imposed upon managers and supervisors of a political subdivision under Chapter 4112"). The Court finds this line of cases both persuasive and applicable. Here, Davis brings an individual capacity retaliation claim pursuant to Ohio Revised Code § 4112, which expressly provides for liability. Accordingly, in light of Ohio Revised Code § 2744.03(A)(6)(c) , Judge Musick is not

20

entitled to immunity.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part. (ECF No. 33.) Davis' official capacity retaliation claim under Title VII and individual capacity retaliation claim under Ohio Revised Code Chapter 4112 remain pending. The remainder of Davis' claims are **DISMISSED**. The Clerk is **DIRECTED** to terminate Defendant Wesley Skaggs from this action.

**IT IS SO ORDERED.**

4 - 23 - 2013
**DATE**

EDMUND A. SARGUS, JR.
**UNITED STATES DISTRICT JUDGE**